UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

Mabuba Abajebel Abafita,

Plaintiff,

-against-

Latifa Mubarak Ahmed Eisa Aldukhan et al.,

Defendants.

</td></tr>
</table>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _04/04/2019_

1:16-cv-06072 (RMB) (SDA)

**REPORT AND RECOMMENDATION**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE RICHARD M. BERMAN, UNITED STATES DISTRICT JUDGE:**

Plaintiff Mabuba Abajebel Abafita ("Abafita" or "Plaintiff") asserts claims in this action against Defendants Latifa Mubarak Ahmed Eisa Aldukhan ("Aldukhan"), Marwa Ateeq Salim Binhada Alsuwaidi ("Alsuwaidi") and Omar Obaid Humaid Bader Almansoori ("Almansoori") (collectively, "Defendants") under, *inter alia*, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), the New Jersey Wage and Hour Law ("NJWHL") and the common law. Plaintiff alleges that, for nearly six years, Defendants forced her to work as a domestic servant and subjected her to abominable living and working conditions in Dubai, United Arab Emirates ("UAE"), New York and New Jersey. All Defendants failed to answer or otherwise defend, a default was entered against them and District Judge Berman referred an inquest on damages to me.

I respectfully recommend that Judge Berman award Plaintiff damages against Defendants in the sums set forth in the Conclusion below.

## PRODCEDURAL HISTORY

Abafita initiated this action on August 1, 2016. (*See* Compl., ECF No. 7.) On August 4, 2016, Defendants were each personally served with the summons and complaint at their place of residence in New Jersey.[1] (*See* Affs. of Service, ECF Nos. 13-15.) On December 1, 2016, Abafita filed her First Amended Complaint (ECF No. 24), which is her operative pleading.

Defendants were each personally served in the United Arab Emirates with summonses and copies of the First Amended Complaint, as well as translated versions of those documents, on or around January 25, 2017. (*See* Affs. of Service, ECF Nos. 31-33.) Defendants failed to appear or respond, and on February 23, 2018, the Clerk of the Court entered a Certificate of Default against all Defendants. (Default Certificate, ECF No. 44.)

On October 2, 2018, Judge Berman issued an Order for Defendants to show cause on November 8, 2018 why a default judgment as to liability should not be entered against them, and an inquest should not be held to determine the amount of Plaintiff's damages. (Order To Show Cause, ECF No. 48.) By separate Order, he referred the inquest to me. (ECF No. 49.)

A hearing was held before Judge Berman on November 8, 2018, at which Defendants failed to appear. Judge Berman entered an Order requiring Plaintiff to furnish the Court with a sworn statement supporting both liability and damages. (11/9/18 Order, ECF No. 61.) Plaintiff filed a Declaration on December 6, 2018. (Pl.'s Decl., ECF No. 64.)

---

[1] Plaintiff believes that Defendants fled the United States for the UAE on or about August 8, 2016. (*See* Am. Compl., ECF No. 24, ¶ 62.)

An inquest hearing was held before me on March 7, 2019. At the inquest, Plaintiff herself testified, and Plaintiff proffered Licensed Clinical Social Worker Crystal DeBoise as an expert.[2] DeBoise provided expert testimony at the hearing.

## FINDINGS OF FACT[3]

I make the following findings of fact, pursuant to Federal Rule of Civil Procedure 52:[4]

### Events Occurring Outside The United States

In October 2010, while in Ethiopia, Abafita was recruited to work for Defendant Aldukhan in the UAE.[5] (Am. Compl. ¶¶ 12-13.) In Ethiopia, Abafita met a man known as Mr. Sayed, who arranged for her employment as a domestic worker in the UAE in exchange for 8,000 Ethiopian bin ($343.00 USD). (Id.; Pl.'s Decl. ¶ 6.) When Ms. Abafita arrived in the UAE, Defendant Aldukhan seized her passport and brought her to Aldukhan's compound. (Am. Compl. ¶ 15; Pl.'s Decl. ¶ 7.) Abafita started working for Aldukhan in the UAE in approximately November 2010. (Tr.[6] at 13.)

Defendant Aldukhan promised to pay Abafita 700 UAE dirhams ("AED") (approximately $190 USD) per month for her work. (Tr. at 12; Am. Compl. ¶ 16; Pl.'s Decl. ¶ 8.) Defendant Aldukhan forced Abafita to work 21-hour days cooking, cleaning and babysitting for Defendant

---

[2] Prior to the hearing, Plaintiff submitted a Report of Psychological Assessment prepared by DeBoise ("DeBoise Report"). (See ECF No. 68.)

[3] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

[4] My factual findings are derived in part from Plaintiff's Amended Complaint. Upon a defendant's default, the well-pleaded allegations of a plaintiff's complaint are accepted as true for the purpose of establishing the defendant's liability. See Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009).

[5] Plaintiff in her testimony confirmed the allegations of how she was treated by Defendants, i.e. her working conditions, confinement and so on.

[6] References to the transcript of the inquest hearing are made using the prefix "Tr." Abafita testified at the hearing and I found her testimony to be credible.

3

Aldukhan, her mother and six other families. (*See* Tr. at 9-10; Am. Compl. ¶¶ 15-18; Pl.'s Decl. ¶¶ 8, 11-12.) Defendants subjected Abafita to inhumane living conditions and constant verbal abuse, which kept Abafita in a persistent state of exhaustion. (*See* Am. Compl. ¶¶ 19-21, 25.)

Abafita slept in a small laundry room (Tr. at 10) and was prohibited from taking food breaks or leaving the compound unescorted. (Am. Compl. ¶¶ 19-21; Pl.'s Decl. ¶ 13.) Defendant Aldukhan regularly insulted Abafita, calling her "filthy," "dirty" and "a dog." (Am. Compl. ¶ 20; Pl.'s Decl. ¶ 14.) Defendant Aldukhan threatened Abafita with deportation if she disobeyed her orders and warned Abafita that she would go to jail if she tried to escape. (Tr. at 10-11; Am. Compl. ¶¶ 20-22; Pl.'s Decl. ¶ 14.)

Defendant Aldukhan asserted economic pressure on Abafita to intimidate her from trying to escape. Aldukhan told Abafita that Aldukhan had incurred 20,000 AED in expenses in bringing Abafita to the UAE (Tr. at 12), and to return home, Abafita first had to reimburse Aldukhan for that full amount, which money Abafita did not have. (*See* Am. Compl. ¶ 24; Pl.'s Decl. ¶ 15.)

**Events Occurring Within The United States**

In April 2016, Defendant Aldukhan lured Abafita to the United States with promises of higher wages. (*See* Tr. at 14-15; Am. Compl. ¶¶ 28-29; Pl.'s Decl. ¶ 17.) Pursuant to a domestic servant contract,[7] Defendant Aldukhan promised to pay Abafita $1,610.04 USD per month while in the United States; Abafita would work eight hours per day, five days per week; and Abafita would receive overtime compensation at a rate of 150% of her normal wages. The contract further specified that Defendant Aldukhan would be responsible for Abafita's medical

---

[7] Plaintiff's counsel provided a copy of the contract to the Court at the inquest hearing, which I accepted into evidence as Exhibit A.

expenses in the United States, Defendant Aldukhan would not withhold Abafita's passport, and Abafita would be entitled to sick leave and vacation leave. (Pl's. Ex. A.)

Abafita worked both in New York and New Jersey. (Tr. at 16-17.) She testified that her working conditions in the United States were "much harder" than in the UAE. (Tr. at 16.) Abafita was brought to the United States to provide childcare to the infant child of Defendants Alsuwaidi and Almansoori.[8] (Am. Compl. ¶ 28.)  From April 20 to 22, 2016, Abafita worked for Defendants while they were staying in a hotel in Manhattan. (*Id*. ¶ 33.) From April 22 to May 22, 2016, Abafita worked for Defendants while they were residing in a furnished apartment in a residential building in Manhattan. (*Id*. ¶ 34.) During this time, Abafita only was permitted to sleep directly on the hardwood floor in front of Aldukhan's bedroom door. (Tr. at 17; Am. Compl. ¶ 35.)

On or about May 21, 2016, the two older children of Defendants Alsuwaidi and Almansoori came to the United States and Abafita then was required to care for them as well. (Am. Compl. ¶ 36.) On May 22, 2016, Defendants moved to River Terrace at Port Imperial, a luxury residence in West New York, New Jersey. (*Id*. ¶ 38.) Abafita stayed there with Defendants until she escaped on June 9, 2016. (*Id*. ¶ 59.) During the period from May 22 to June 9, 2016, Abafita only was permitted to sleep directly on the carpeted floor beside Aldukhan's bedroom door. (*Id*. ¶ 40.)

In both New York and New Jersey, Abafita worked 19 to 22-hour days with no days off, performing domestic tasks for Defendants and caring for the child or children of Defendants Alsuwaidi and Almansoori. (Am. Compl. ¶¶ 33-34, 36-39; Pl.'s Decl. ¶ 19.) Defendants failed to

---

[8] Plaintiff testified at trial that Aldukhan was the mother of Alsuwaidi, and Alsuwaidi was married to Almansoori. (Tr. at 13, 15.)

pay any wages to Abafita for the period she worked for them in the United States from April to June 2016. (Am. Compl. ¶¶ 41-43.) Defendants retained possession of Abafita's passport, prohibited her from leaving their home by herself, prevented her from speaking to anyone outside their presence and warned her that if she did speak with anyone else, she risked having her throat slashed. (*See* Am. Compl. ¶¶ 45-48; Pl.'s Decl. ¶ 20.) Defendants verbally abused Abafita, calling her a "dog" and an "animal," and threatened that, if she disobeyed them, they would throw her down a garbage chute. (Tr. at 17; Am. Compl. ¶ 50; Pl.'s Decl. ¶ 21.)

Defendants denied Abafita access to medical care. In or about May 2016, she was experiencing terrible pain. She begged Defendants to allow her to see a doctor. Defendants accused her of faking her illness and punished her for requesting medical attention. When her situation worsened, Defendants took her to the emergency room, where she was diagnosed with painful ovarian cysts. (*See* Tr. at 20.) Defendant Alsuwaidi translated the doctor's diagnosis for Abafita. (*Id.*) Instead of telling Abafita that she had ovarian cysts, Alsuwaidi told Abafita that there was nothing wrong with her and Abafita had been faking her illness. Abafita only found out later the nature of her diagnosis because someone else told her what her medical records actually said. (*Id.*; Pl.'s Decl. ¶ 23.)

On or about June 9, 2016, Abafita escaped Defendants' control. (Tr. at 21.) Approximately six weeks later, Abafita encountered Defendants at a public mall. Defendant Alsuwaidi grabbed her arm while the other Defendants surrounded her and ordered her to return to their custody. Abafita was able to escape. (*See* Am. Compl. ¶¶ 59-60; Pl.'s Decl. ¶ 24.)

Abafita claims to have suffered emotional distress due to Defendants' "coercive and abusive tactics in forcing [her] to work for them." (Pl.'s Decl. ¶ 25.) She asserts that her

experience with Defendants "has affected the current relationships [she has] with [her] employers and family." (*Id*.) She further asserts that she has trouble falling asleep and that she "sometimes [has] nightmares about Ms. Aldukhan and feel[s] like [she is] back in Dubai working for her again." (*Id*.) She testified that she is "very stressed out," "always anxious," "[hasn't] felt happy or excited about anything in a very long time," "[has] really bad headaches" and that her experiences working for Defendants "has just been a tremendous . . . negative impact on my life." (Tr. at 22.)

**Plaintiff's Expert Testimony**

I found that, based upon her knowledge, skill, experience, training and education,[9] DeBoise qualified as an expert in clinical psychology whose opinion would assist me in arriving at the truth. DeBoise was a credible witness and her testimony had a reasonable basis.

DeBoise's expert opinion is that Abafita developed "very serious" Post Traumatic Stress Disorder ("PTSD") as a direct result of her treatment by Defendants. (Tr. at 33.) DeBoise testified about Plaintiff's continued emotional distress. DeBoise examined Abafita for over six hours on two occasions (Tr. at 25-27), and concluded that Abafita continues to suffer long-term psychological damage and severe PTSD as a result of her experience with Defendants. (Tr. at 28-29; DeBoise Report at 1.) DeBoise testified that Abafita experiences trouble sleeping, auditory intrusions, intrusive thoughts and nightmares, among other symptoms, and that these symptoms were caused by and directly related to Abafita's working for Defendants. (Tr. at 29-

---

[9] DeBoise received a bachelor's degree in psychology from Grand Valley State University in Michigan and a master's degree in social work, followed by postgraduate studies in clinical social work, after which she became a Licensed Clinical Social Worker in the State of New York. (Tr. at 24.) Further, she has worked with survivors of human trafficking since the early 2000s, including starting one of the first human trafficking programs in the United States, and receiving one of the first federal grants for human trafficking survivors in the United States. (*Id.*)

30; DeBoise Report at 8-9.) DeBoise pointed to the direct threats made by Defendants to Plaintiff as a particular source of Abafita's PTSD. (Tr. at 30-31.)

### LEGAL CONCLUSIONS

The Court makes the following Conclusions of Law:

**I.**   **Plaintiff Is Entitled To Damages Under The TVPRA**

   **A.   Legal Standards**

Section 1589 of the TVPRA prohibits:

> knowingly . . . obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. . . .

18 U.S.C. § 1589(a).

> "[S]erious harm" is defined as:

> any harm, whether physical or nonphysical, including psychological, financial or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

*Id.* at § 1589(c)(2).

Section 1584 prohibits "knowingly and willfully hold[ing] to involuntary servitude . . . any other person for any term." 18 U.S.C. § 1584(a). This provision is violated by the creation of "'a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or

the legal process . . ..'" *McGarry v. Pallito*, 687 F.3d 505, 511 (2d Cir. 2012) (quoting *United States v. Kozminski*, 487 U.S. 931, 952 (1988)).

To determine whether an employer's conduct was sufficiently serious to coerce a plaintiff to provide labor against her will, the Second Circuit applies a hybrid standard. *See United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015). A factfinder may "consider the particular vulnerabilities of a person in the victim's position but . . . her acquiescence [must] be objectively reasonable under the circumstances," taking into account whether "a reasonable person of the same background and circumstances would have also felt coerced." *Id*.

The TVPRA has extraterritorial effect. Section 1596, which Congress added via an amendment to the TVPRA in 2008, provides, in relevant part: "[T]he courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under [18 U.S.C.] section 1581, 1583, 1584, 1589, 1590, or 1591 if . . . an alleged offender is present in the United States, irrespective of the nationality of the alleged offender." 18 U.S.C. § 1596(a)(2). "[B]y conferring extra-territorial jurisdiction over any offense . . . under the TVPRA, § 1596 permits private parties to pursue a civil remedy under the TVPRA for extraterritorial violations." *Adhikari v. Kellogg Brown & Root, Inc*., 845 F.3d 184, 204 (5th Cir. 2017) (alteration in original and internal quotation marks omitted), *cert denied*, 138 S. Ct. 134 (2017); *see also United States v. Baston*, 818 F.3d 651, 666-71 (11th Cir. 2016) (upholding the constitutionality of section 1596(a)(2) and ordering $400,000 in restitution based on defendant's conduct that occurred in Australia, which came within the TVPRA's extraterritorial reach when defendant entered United States), *cert. denied*, 137 S. Ct. 850 (2017).

Under the TVPRA, victims of forced labor and involuntary servitude "may bring a civil action against the perpetrator . . . and . . . recover damages and reasonable attorneys [sic] fees." 18 U.S.C. § 1595. Emotional distress damages are available for violations of the TVPRA. *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 594 (S.D.N.Y. 2012) (awarding $500,000 for TVPRA violation). Courts also have awarded punitive damages for TVPRA claims. *See id.* (awarding $300,000 where conduct morally culpable).

**B.  <u>Application</u>**

The Court finds that Defendants knowingly obtained Abafita's labor by engaging in a scheme, plan or pattern designed to cause her reasonably to believe that she had no alternative but to remain in Defendants' employ or suffer serious harm. They implemented their scheme by trafficking Abafita from Ethiopia to the UAE, and then into the United States, with false promises (*i.e.*, increasing her wages) regarding her employment. Defendants then required her to work gruelingly long hours under inhumane conditions for little to no pay. Defendants compelled Abafita to work for them by withholding Ms. Abafita's passport; confining Ms. Abafita to their residence; reprimanding Ms. Abafita for speaking with anyone other than Defendants or their family members; prohibiting Ms. Abafita from obtaining necessary medical services; warning Ms. Abafita that if she disobeyed their orders, they would throw her down a garbage chute; and frightening Ms. Abafita into believing that if she communicated with anyone outside the family she risked having her throat cut.

The Court also finds that Defendant Aldukhan is also liable for her conduct against Ms. Abafita in the UAE, pursuant to the TVPRA's extraterritorial application. Defendant Aldukhan engaged in similar conduct against Abafita in the UAE as Defendants did against her in the

United States, causing her to work brutal 21-hour work days. Defendant Aldukhan compelled Abafita to work for her in the UAE by withholding Ms. Abafita's passport; confining her to Defendant Aldukhan's compound in Dubai; threatening to deport her; and placing economic pressure on Abafita by causing her to believe that she first had to reimburse Defendant Aldukhan a large sum of money before she would be permitted to return home.

In determining the quantum of damages to award under the TVPRA, the Court has considered the duration and nature of the Defendants' conduct. Plaintiff seeks emotional distress damages against Defendant Aldukhan for her 2,000 days of servitude in the UAE at a daily rate of $400.00, in the sum of $800,000.00. Plaintiff also seeks emotional distress damages against all three Defendants for her 51 days of servitude in the United States at a daily rate of $450.00, in the sum of $22,950.00. In addition, she seeks punitive damages against Aldukhan in the amount of $800,000.00.

Having carefully considered Plaintiff's submissions, the expert testimony and arguments of counsel, the Court recommends that the amount of $800,000.00 (2,000 days at a daily rate of $400.00) be awarded to Plaintiff for emotional distress damages against Defendant Aldukhan for Plaintiff's time in the UAE. This amount is commensurate with emotional distress awards in other TVPRA cases.[10] This amount also is consistent with emotional distress awards in this

---

[10] Courts have awarded damages for emotional distress to trafficking victims subjected to forced labor in amounts ranging from $415.00 to $800.00 per day. *See, e.g.*, *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1174 (D. Kan. 2018) (plaintiff, who was an adolescent girl during vast majority of 10-year mistreatment, awarded $800.00 per day); *Gurung*, 851 F. Supp. 2d 583 at 594 (awarding estimated $415.00 per day to victim forced to work 16 hours per day, seven days a week, for 40 months as a maid); *Doe v. Howard*, No. 11-CV-1105, 2012 WL 3834867, at **3-4 (E.D. Va. Sept. 4, 2012) (awarding $500.00 a day to a victim forced to work 80-90 hours per week and confined in defendants' home for three months); *Shukla v. Sharma*, No. 07-CV-2972 (CBA) (CLP), 2012 WL 481796, at **8-9 (E.D.N.Y. Feb. 14, 2012) (awarding $780.00 a day to a victim forced to work 17 hours per day for three and a half years).

Circuit outside the TVPRA context.[11] The Court also recommends that the amount of $22,950.00 (51 days at a daily rate of $450.00) be awarded to Plaintiff against all three Defendants for Plaintiff's time in the United States, based upon testimony at the hearing that she worked much harder in the United States,[12] justifying the increase to $450.00 per day.

In addition, the Court awards the amount of $800,000.00 in punitive damages to Plaintiff against Aldukhan due to the egregious nature of Aldukhan's conduct. In the Court's view, Defendant Aldukhan was the primary malefactor in this case. (*See also* DeBoise Report, ECF No. 68-1, at 3 ("the primary abuser was Ms. Aldukhan").) The Court declines to award punitive damages against the other Defendants, especially given that their conduct occurred over a shorter period of time, and their conduct was not singled out by Plaintiff's expert.[13]

II.   **Plaintiff Is Entitled To Damages For Breach Of Contract**

   A.   **Legal Standards**

To establish a claim for breach of contract under either New York or New Jersey law, Plaintiff must prove: (1) a binding contract exists; (2) the plaintiff performed under the contract; (3) the defendant breached the contract; and (4) the breach resulted in damages. *See*

---

[11] "Garden variety" emotional distress claims, where the evidence of mental suffering typically is limited to testimony of the plaintiff, "generally merit $30,000 to $125,000 awards*." Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009). However, where there is medical testimony and evidence, greater amounts are awarded. *See id.* (on motion brought pursuant to Federal Rule of Civil Procedure Rule 50, upholding jury award $500,000 to plaintiff in discrimination case).

[12] *See* Tr. at 16 ("The working conditions in the United States were much harder than they were in Dubai.")

[13] The New Jersey Human Trafficking Prevention, Protection and Treatment Act permits Abafita to recover the same damages as under the TVPRA. However, because Plaintiff is not entitled to a double recovery, Abafita only sought damages on her trafficking claims under the TVPRA. (*See* Pl.'s Mem., ECF No. 50, at 20 n.4.) Similarly, because Plaintiff will be recovering emotional distress damages under the TVPRA claim, she does not seek damages under her common law emotional distress and false imprisonment claims, which she admits would amount to "double recovery." (Pl.'s Mem. at 28-29.)

*Owens v. Gaffken & Barriger Fund, LLC*, No. 08-CV-8414, 2009 WL 3073338, at *14 (S.D.N.Y. Sept. 21, 2009); *Moreno v. Tringali*, No. 14-CV-4002, 2017 WL 2779746, at *4 (D.N.J. June 27, 2017).

### B.  Application

Based upon the allegations contained in Plaintiff's pleadings, as well as her testimony at the inquest and the evidence submitted at the hearing, the Court finds that a binding contract exists between Plaintiff and Defendants. *See Lynch v. Savarese*, 217 A.D.2d 648, 650, 629 N.Y.S.2d 804, 806 (2d Dep't 1995) ("[E]ven if no signed copy of the [contract] can be found, the appellants could still prove its existence by extrinsic evidence."). Defendants failed to pay Plaintiff in accordance with the terms of the contract, and Plaintiff is entitled to the damages sought by her. Thus, Plaintiff is entitled to recover from Defendants the $13,770.75 she seeks for breach of contract.[14] (*See* Arora Decl., Ex. 7,[15] ECF No. 51-7.)

### III.    Plaintiff Is Entitled To Damages For Spread Of Hours

### A.  Legal Standards

The NYLL requires an employer to pay an employee who works more than ten hours in one day an additional hour at the minimum wage. *Gurung*, 851 F. Supp. 2d at 591 (citing N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.4).

---

[14] Because Plaintiff's damages for breach of contract "are greater than her statutory damages for underpayment of wages," Plaintiff is not seeking both. (Pl.'s Mem. at 25 ("She is not entitled to recover both [on statutory wage claim and breach of contract], however, as that would amount to a "double recovery.").) Thus, because the Court is recommending that she recover contractual damages, the Court does not address herein the amounts that would be owed to Plaintiff under FLSA and the New York and New Jersey wage and hours laws for minimum wage.

[15] Plaintiff submits as Exhibit 7 to the Declaration of Reena Arora, who previously served as counsel of record for Plaintiff, a calculation of the damages she seeks for her wage claims.

**B.  Application**

Because Ms. Abafita worked more than 10 hours every day that she was employed by

Defendants in New York (*see* Am. Compl. ¶ 33-34), she is owed from Defendants an additional

hour's pay for each of these 32 days—a total of $288.00. (*See* Arora Decl., Ex. 7.)

**IV.  Plaintiff Is Entitled To Liquidated Damages Under New York Law**

**A.  Legal Standards**

Under the NYLL, a plaintiff is entitled to recover liquidated damages in an amount equal

to the amount of underpayment—which includes unpaid regular minimum wages, unpaid

overtime and spread-of-hours damages—unless the employer demonstrates that it acted in

good faith. See N.Y. Lab. L. §§ 198(1-a), 663(1).

**B.  Application**

In the present case, Defendants acted willfully and in bad faith by forcing Abafita to

work excessively long hours for no pay. Moreover, Defendants subjected Ms. Abafita to threats

of imprisonment and deportation. Thus, Abafita is entitled from Defendants to the $8,640.00 in

liquidated damages she seeks under the NYLL. (*See* Arora Decl., Ex. 7.)

**V.  Plaintiff Is Entitled To Recovery For Pay Rate Notice And Wage Statement Violations**

**A.  Legal Standards**

The NYLL requires an employer to provide each employee with notice of and statements

showing the employee's pay rate and wages. *See* N.Y. Lab. L. §§ 195(1), 195(3). An employee

who does not receive a copy of a written notice containing information about her pay rate

within 10 days of her first day of employment can recover $50.00 in damages for each work day

that the violation occurred, up to a statutory maximum of $5,000.00. *See* id. § 198(1-b). In

addition, employees who do not receive a written statement each payday of days worked and wages earned can recover $250.00 in damages for each work day that the violations occurred, up to a statutory maximum of $5,000.00. *See id*. § 198(1-d).

**B.  Application**

Abafita is entitled to damages for Defendants' failure to obey the NYLL's notice and wage statement requirements. Abafita never was paid and therefore never received corresponding notice of wage statements during the 32 days she worked for Defendants in New York. As such, pursuant to section 198(1-d) of the NYLL, Abafita is entitled to from Defendants recover the statutory maximum of $5,000.00, and pursuant to section 198(1-b), she is entitled to recover from Defendants $1,600.00 for the 32 days that she did not receive written notice of her pay rate. (*See* Arora Decl., Ex. 7.)

**VI.  Plaintiff Is Entitled To Recover Prejudgment Interest**

**A.  Legal Standards**

"A plaintiff who prevails on a NYLL wage claim is entitled to prejudgment interest on any 'underpayment' of wages." *Salustio v. 106 Columbia Deli Corp*., 264 F.Supp.3d 540, 557 (S.D.N.Y. 2017) (quoting NYLL § 198(1-a)). Under the NYLL, the 9% interest rate provided in N.Y. C.P.L.R. §§ 5001, 5004 applies. Where unpaid wages "were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. § 5001(b) (McKinney 2019).

**B.  Application**

Here, Abafita is entitled to collect nine-percent prejudgment interest on her NYLL unpaid minimum wages and overtime pay, spread-of-hours, and New York breach of contract

damages. Because Abafita's breach of contract damages are redundant of her NYLL unpaid minimum wages and overtime pay damages, interest is properly calculated only with respect to the breach of contract and spread-of-hours damages. (Pl.'s Mem. at 26.) Thus, interest should be awarded against Defendants on the sum of $14,058.75 at a rate of 9% simple interest from May 5, 2016 (the midpoint of her employment period in New York) through the date that the default judgment is entered.

## VII.   Plaintiff Is Entitled To Attorneys' Fees

### A.   Legal Standards

Under the FLSA and NYLL, a prevailing party is entitled to recover reasonable attorneys' fees and costs. *See* 29 U.S.C. § 216(b); NYLL §§ 198(1-a), 663; *accord Young v. Cooper Cameron Corp.*, 586 F.3d 201, 208 (2d Cir. 2009) ("The FLSA provides that a court 'shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.'") (quoting 29 U.S.C. § 216(b)). Plaintiff also is entitled to recover attorneys' fees and costs under New Jersey law for her claims brought under the NJWHL. *See* N.J.S.A 34:11-56.8; *accord Qu Wang v. Fu Leen Meng Rest. Ltd. Liab. Co.*, Case No. 16-CV-08772 (NLH) (AMD), 2018 WL 1027446, at *5 (D.N.J. Feb. 23, 2018).

A plaintiff also may recover attorneys' fees under the TVPRA. Section 1595 of the TVPRA specifically states that:

> An individual who is a victim of a violation [of the substantive provisions of the TVPRA] may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595; *see also Lipenga v. Kambalame*, Case No. 14-CV-3980 (GJH), 2017 WL 2493101 (D. Md. June 8, 2017) (awarding attorneys' fees for violations of, *inter alia*, TVPRA after entry of default judgment against Defendant).

"For purposes of attorneys' fees, plaintiff is considered a prevailing party if she succeeded on any significant issue in litigation which achieves some of the benefit [she] sought in bringing suit." *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1178 (D. Kan. 2018) (internal quotation marks and citation omitted). This includes securing a default or default judgment. *Id.* ("Plaintiff is a prevailing party because the court is entering a default judgment on her TVPRA, FLSA, RICO and Kansas, New Jersey, New York and Ohio human trafficking and minimum wage state law claims. This entitles her to recover reasonable attorneys' fees"); *see also MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC*, Case No. 16-CV-8103 (LGS), 2017 WL 1194372 (S.D.N.Y. Mar. 30, 2017), at *1 ("Plaintiff . . . is the prevailing party by virtue of the Default Judgment entered in its favor") (internal quotation marks omitted). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

While a district court retains discretion to determine what constitutes a reasonable fee, "this discretion is not unfettered." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011). "[W]hen a prevailing party is entitled to attorneys' fees, the district court must abide by the procedural requirements for calculating those fees articulated by [the Second Circuit] and the Supreme Court." *Id.* "Both [the Second Circuit] and the Supreme Court have held that the lodestar — the product of a reasonable hourly rate and the reasonable number of hours required by the case — creates a 'presumptively reasonable fee.'" *Id.* (citing *Perdue v. Kenny A.*

*ex rel. Winn*, 559 U.S. 542 (2010) and *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 189-90 (2d Cir. 2008)). This approach is intended to "produce[] an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue*, 559 U.S. at 551 (citations omitted; emphasis in original).

A reasonable rate is generally the "prevailing market rate[] for counsel of similar experience and skill to the fee applicant's counsel." *Farbotko v. Clinton County*, 433 F.3d 204, 209 (2d Cir. 2005). In deciding what constitutes a reasonable rate, courts may consider "rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district."[16] *Id*.

"To determine a reasonable number of hours of work for a particular case, courts first look for documentation in the form of contemporaneous time records specifying, for each attorney, the date, the hours expended, and the nature of the work done." *Rios v. Louya Corp.*, Case No. 14-CV-6800 (GHW), 2015 WL 5918194, at *5 (S.D.N.Y October 8, 2015) (internal quotation marks and citation omitted). Additionally, the court "may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *DiFilippo v. Morizio*, 759 F.2d 231, 236 (2d Cir. 1985).

A court should consider other case-specific variables when determining the amount of attorneys' fees to award, including:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the

---

[16] "The relevant community to which the court should look is the district in which the case was brought." *Marisol A. ex rel. Forbes v. Giuliani*, 111 F. Supp. 2d 381, 386 (S.D.N.Y. 2000).

attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Arbor Hill Concerned Citizens Neighborhood Ass'n*, 522 F.3d at 187.

### B.  Application

Defendants have defaulted in this action, and so Plaintiff is the prevailing party. Thus, she is entitled to recover attorneys' fees under the TVPRA, FLSA, NYLL and NJWHL.

Plaintiff requests that the Court award her a total of $120,950.00 in attorneys' fees and $1,301.00 in costs. (Bertaccini Decl., ECF No. 71, ¶ 7.) In support of her request, Plaintiff's counsel submitted declarations from Daniel Bertaccini, Special Counsel from the law firm Stroock & Stroock & Lavan ("Stroock") (*id.*), and from Tito Sinha, Supervising Attorney of the Workers' Rights Practice in the Community Development Project at the Urban Justice Center ("Urban Justice") (Sinha Decl., ECF No. 70). Annexed to the Declarations are contemporaneous time records maintained by attorneys from both Stroock and Urban Justice, which reflect the attorney time spent working on this matter.[17] (*See* Stroock Time Records, Bertaccini Decl. Ex. B, ECF No. 71-2; Urban Justice Time Records, Sinha Decl. Ex. A, ECF No. 70-1.) In addition, the Declarations contain information about attorneys from Stroock and Urban Justice (other than Bertaccini and Sinha) who worked on this case.[18]

---

[17] Plaintiff does not seek the award of non-attorney time, including time spent on this matter by paralegals. (Bertaccini Decl. ¶ 4.)

[18] Laura Misumi, who is listed on the docket as attorney of record in this case, is a staff attorney at Urban Justice, and graduated as a Public Interest Law Scholar from Northeastern University School of Law in 2014; she was admitted to practice in the state of Michigan in 2014 and the state of New York in 2017. (Sinha Decl. ¶¶ 21-25.) Bertaccini attached to his Declaration the attorney biographies for

Plaintiff seeks attorneys' fees at the hourly rate of $450.00 for all senior attorneys who worked on this matter, and the hourly rate of $250.00 for all junior attorneys. (Sinha Decl. ¶¶ 35-36; Bertaccini Decl. ¶ 5.) "Courts in this district have generally determined that the range of appropriate fees for experienced civil rights and employment law litigators is between $250 and $450." *Rios*, 2015 WL 5918194, at *3 (S.D.N.Y October 8, 2015) (discussing generally-awarded rates of $350-$450 for partners, and $200-$275 for more junior attorneys). The Court finds that these hourly rates sought are reasonable.[19]

Regarding hours worked, the Court finds the time records submitted by Plaintiff's counsel (*see* Urban Justice Time Records; Stroock Time Records) to be sufficiently detailed and reasonable. *See Rios*, 2015 WL 5918194, at *5. Accordingly, the Court recommends awarding Plaintiff $120,950.00 in attorneys' fees, which is the amount sought, calculated by multiplying

---

attorneys from Stroock who has worked on this matter, including: Kevin J. Curnin (Partner), the Hon. Shira Scheindlin (Of Counsel), Curtis C. Mechling (Of Counsel), Bertaccini, David J. Kahne (Special Counsel) and Elizabeth Milburn (Law School Graduate). (Bertaccini Decl. Ex. C, ECF No. 71-3.) Bertaccini further states that the requested hourly rates for the Stroock attorneys "have been reduced substantially from [Stroock's] going rates for the same attorneys in billed matters," in order to "align with fees awarded in this district for purposes of this fee application." (Bertaccini Decl. ¶ 5.)

[19] The Court recognizes that attorneys from Stroock and Urban Justice perform a variety of legal work and are not solely "civil rights and employment law litigators" as articulated in *Rios*, but finds that Plaintiff's legal team has extensive relevant litigation experience which warrants approval of the hourly rates sought. Specifically, the Court considers the work done by Sinha and Bertaccini, who spent the most time on this matter from Urban Justice and Stroock, respectively. (Sinha recorded 5.1 hours in contemporaneous time records on this matter (Sinha Decl. ¶¶ 27-29, 37-38; *see* Urban Justice Time Records) and Bertaccini recorded 187.3 hours (Stroock Time Records at 12).) Sinha became a member of the bar in both New York and New Jersey in 1998 (Sinha Decl. at ¶ 11); thus he has been practicing for over twenty years. His experience as an attorney during this time includes public interest roles including at the Asian American Legal Defense and Education Fund (*id.* at ¶ 13), and includes plaintiff-side work in private practice. (*Id.* at ¶¶ 14-17.) His work on wage-and-hour cases began during his time as a solo practitioner from 2004-2008, which work he has continued since that time. (*Id.* at ¶¶ 15-20.) Bertaccini, Special Counsel at Stroock, graduated from Benjamin N. Cardozo School of Law in 2010 and has been admitted to practice in the state of New York since 2011, and in this District since 2014. (Bertaccini Decl. Ex. C at 20.) He has litigated "numerous civil litigation matters at both the trial and appellate level" and "is an experienced complex commercial litigator." (*Id.* at 19.)

the reasonable hourly rate for each attorney by the number of hours he or she worked, according to the billing sheets submitted by Plaintiff. (*See* Stroock Time Records at 12; Urban Justice Time Records; *see also* Sinha Decl. ¶¶ 37-38.)

In addition to attorneys' fees, Plaintiff seeks certain costs. "Costs are defined as 'those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'" *Apolinario v. Luis Angie Deli Grocery, Inc.*, Case No. 14-CV-2328 (GHW), 2015 WL 4522984, at *4 (S.D.N.Y. July 27, 2015) (quoting *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998)). Plaintiff seeks only those costs incurred in connection with translating the amended complaint and amended summonses into Arabic, which totals $1301.00. (Bertaccini Decl. ¶¶ 3-4.) Plaintiff does not seek costs related to obtaining an interpreter, effecting service of the amended complaint on each Defendant within UAE and retaining Plaintiff's damages expert. (*Id.*) I find the requested costs to be reasonable.

Considering all relevant factors, the Court finds that the attorneys' fees and costs sought by Plaintiff's counsel are reasonable, and recommends they be awarded against Defendants in the amount sought of $122,251.00 ($120,950.00 for attorneys' fees, and $1301.00 for costs).

## **CONCLUSION**

For the foregoing reasons, I respectfully recommend that the Court enter judgment in favor of Plaintiff against the Defendants, as follows: (1) judgment should be entered on the TVPRA claims against Defendant Latifa Mubarak Ahmed Eisa Aldukhan alone in the sum of $1,622,950.00; (2) judgment should be entered on the TVPRA claims against Defendants Marwa Ateeq Salim Binhada Alsuwaidi and Omar Obaid Humaid Bader Almansoori, jointly and severally, in the amount of $22,950.00; and (3) judgment should be entered on the remaining

claims against Defendants Latifa Mubarak Ahmed Eisa Aldukhan, Marwa Ateeq Salim Binhada Alsuwaidi and Omar Obaid Humaid Bader Almansoori, jointly and severally, in the amount of $29,298.75.

I further recommend that pre-judgment interest be awarded in favor of Plaintiff on the sum of $14,058.75 at a rate of 9% simple interest from May 5, 2016 through the date that the default judgment is entered, and that attorneys' fees and costs be awarded in the amount of $122,251.00. Pre-judgment interest, attorneys' fees and costs should be awarded against all three Defendants, jointly and severally.

**SO ORDERED.**

DATED:        New York, New York
              April 4, 2019


              _____
              STEWART D. AARON
              United States Magistrate Judge


                        *        *        *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the

Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Berman.

**THE FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

**The Clerk of Court is directed to mail a copy of this Report and Recommendation to the defendants at each of the following addresses**:

**Latifa Mubarak Ahmed Elsa Aldukhan**
The Alexander
100 Alexander Way
Edgewater, NJ 07020;

and

Al Noor Street No. 7 al-Turrfah
Villa No. 5, P.O. Box 782
Sharjah, United Arab Emirates

**Marwa Ateeq Salim Binhada Alsuwaidi**
The Alexander
100 Alexander Way
Edgewater, NJ 07020;

and

Al Twar 2
Street No. 22, Villa No. 4
Dubai, United Arab Emirates

**Omar Obaid Humaid Bader Almansoori**
The Alexander
100 Alexander Way
Edgewater, NJ 07020;

and

Al Twar 2
Street No. 22, Villa No. 4
Dubai, United Arab Emirates